UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

| | |
|---|---|
| IN THE MATTER OF: | Case No. 12-66742-wsd |
| | Chapter 7 |
| LEVI PEOPLES, | Hon. Walter Shapero |
| Debtor. | |
| _____/ | |
| STUART A. GOLD, | |
| Plaintiff, | |
| v. | Adv. Pro. 13-04506-wsd |
| MONIQUE LATRICE MOORE, | |
| Defendant. | |
| _____/ | |
| STUART A. GOLD, | |
| Plaintiff, | |
| v. | Adv. Pro. 13-04507-wsd |
| LEVI PEOPLES | |
| Defendant. | |
| _____/ | |

## **OPINION**

### A. Background

Levi Peoples ("Mr. Peoples") is the debtor in this underlying bankruptcy case. The Chapter 7 Trustee ("Plaintiff") filed two adversary proceedings. The first was against Mr. Peoples for denial of discharge under 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A) and the second against Mr. Peoples' non-filing spouse Monique Moore ("Mrs. Moore") for avoidance of fraudulent transfers and preferential transfers (Plaintiff also seeks disallowance of any claim she might have in Mr.

1

Peoples' Chapter 7 case). Plaintiff also filed a Motion for Sanctions against Mrs. Moore relative to her alleged failure to adequately respond to discovery in the adversary proceeding against her, a ruling on which the Court deferred until after trial. Plaintiff at some point abandoned some of his allegations, such being the preferential transfer allegations relating to vehicle and cash transfers. The remaining allegations in all three matters are (a) in the § 727 proceeding, Mr. Peoples' discharge should be denied by reason of his fraudulent concealment of estate property and failure to disclose assets on his bankruptcy schedules; (b) in the fraudulent transfer/preference proceeding against her, that Mrs. Moore was the recipient of actually and/or constructively fraudulent transfers from Mr. Peoples, specifically those transfers being his transfers to her of large sums of money, some of which was used to purchase real property titled solely in her name; and (c) the indicated discovery sanctions motion against Mrs. Moore. By agreement of the parties, the Court held a consolidated trial on all three of these matters. Mr. Peoples and Mrs. Moore were the only trial witnesses.

B. Findings of Fact as to All Matters

Mr. Peoples and Mrs. Moore married in 1999. They have four children and Mrs. Moore's mother resides with them in the family household. Mr. Peoples is employed as a nurse and is the primary income earner. His income in 2008 was between $70,000 and $80,000. In 2009, his income was around $90,000, in 2010 it was $119,014, and in 2011 it was $106,792. His income currently approximates just above $100,000. He was ordinarily paid by his employer by way of direct deposit into his bank account. He filed this Chapter 7 bankruptcy on December 10, 2012. Mrs. Moore is not a co-debtor. It was stipulated that Mr. Peoples was insolvent from January 1, 2009 to the trial date. His schedules indicate total debts of $110,558.40, all unsecured. In 2009

and 2010, Mr. Peoples was involved in an unsuccessful business venture called Nuwautian Health Foods LLC with respect to which he (but not Mrs. Moore) has some remaining personal liability of at least $20,000.

The couple and/or related indicated entities had the following bank/institutional accounts: (a) Mr. Peoples had a personal Huntington Bank account; (b) Mrs. Moore had a personal JP Morgan Chase account; (c) there was a Community Choice Credit Union business account #0910 in the name of Natural Beauty of Essence, LLC, care of Mrs. Moore; (d) there was another Community Choice Credit Union personal account #0850 in Mrs. Moore's name (for which Plaintiff was unable to obtain bank records, despite having requested statements for *all* bank accounts). That account was apparently closed in July 2011 because of identity theft, and thereafter transformed or rolled over into a new Community Choice Credit Union account #5506, also in Mrs. Moore's name, the balance transferred or rolled over having been approximately $25,000. Plaintiff noted that Mrs. Moore incorrectly testified that account #0850 became account #0910, when in fact, account #0850 actually became account #5506. Account #5506 was not disclosed to Plaintiff until just before trial. Mrs. Moore described the indicated $25,000 as her "life savings" and testified that it was traceable to her above-described income, plus some unspecified amount of cash she had apparently kept at home. Mr. Peoples never made cash deposits into any bank accounts.

Mrs. Moore had some limited income of her own, mostly from various forms of self-employment. She was employed by Citi Mortgage for some unspecified time until around 2008 and earned an unspecified amount of money. In 2008, she earned $11,181 from employment by Direct Buy. Shortly thereafter, she started a beauty products sales company called the referred-to Natural Beauty of Essence, LLC, selling beauty products somewhat informally and earning about

$600 to $800 per month. That income was reduced substantially and became less consistent around December 2010, when she gave birth to a premature baby. That income was apparently deposited in part in the Community Choice Credit Union account #0850, and in part in account #0910 (it is unclear if *all* such income was deposited in one account or another). Around August 2009, she sought and obtained unemployment benefits of some $468 biweekly, most, if not all, of which was deposited in her JP Morgan Chase bank account. She also indicated that she received some apparent form of electronic benefit transfer or pre-loaded debit card that was also associated with these unemployment benefits, but in an unspecified amount. In 2011 and 2012, she made less than $7,000 annually and she indicated that she did not earn enough income to herself necessitate filing income tax returns from 2009 through 2012. The couple filed a joint income tax return for 2008. Mrs. Moore had relatively few debts of her own and did not appear to be jointly liable with her husband on any substantial portion of his debts. Her debts were apparently comprised of $3,000 to $4,000 of educational loans and some credit card debts in unspecified amounts that could have totaled less than $10,000. She had apparently been referred to collection on some unspecified debt(s), but did not believe she had been sued thereon.

Throughout and since the beginning of their marriage, Mr. Peoples would turn over to Mrs. Moore all or part of his wages and she took primary responsibility for managing the family's finances, including paying substantially all of the household bills. Generally, Mr. Peoples would only periodically (every two months or so) inquire as to their financial bottom line. He rarely, if ever, inquired into the status of Mrs. Moore's self-employment businesses. Mr. Peoples entered into his own referred-to Nuwautian Health Foods venture apparently without his wife's knowledge. Its failure resulted in some marital friction that caused, or contributed to, the couple to separate between about May 2010 and May 2012. However, and even during this separation,

4

and although they lived apart, (a) Mr. Peoples turned over to Mrs. Moore all or a substantial portion of his earnings and allowed her to use those sums for her own personal expenses; (b) she continued to pay any shared bills; and (c) the two appear to have continued to operate more or less at least as a single economic unit, much as was the case prior to their separation. Mr. Peoples testified that when the separation ended, the noted friction arising from his failed business venture caused him to cede even greater financial control to Mrs. Moore in an effort to preserve marital harmony.

Prior to October 2010, Mr. Peoples' wages were directly deposited into his Huntington account. Thereafter, and more or less incident to their separation, he arranged to have them directly deposited into Mrs. Moore's Community Choice Credit Union business account #0910. Mr. Peoples testified that the reason for this change was for the convenience of not having to first deposit his wages in his own account and then transfer them to his wife in the form of a check or cash. Generally, and despite the fact that each of their bank accounts were solely in one spouse's name or the other's, substantially all the household earnings were effectively pooled, and, for the most part, were used to pay joint household expenses without any particular allocation as to source of the income or the liability being paid. The testimony of both spouses supports this conclusion, i.e. Mrs. Moore would give to Mr. Peoples spending money for gas and other necessities, as needed, and he also, at times, took small amounts of money for household necessities from his wife's account via debit card withdrawals.

Mrs. Moore purchased the property at 28449 Cherry Hill, Inkster, Michigan on December 15, 2009 for $18,763. The cash for this purchase was traceable to a withdrawal from Mrs. Moore's Community Choice Credit Union account #0850. The title was placed solely in Mrs. Moore's name and she testified the reason for doing so was so that she, in her own words, "could

have a source of income and business." Mr. Peoples testified that the property was put in her name because he believed such would preserve marital harmony, given their past experiences where a different residential investment property that was jointly titled in both their names resulted in marital disagreement as to the management of that property. The Cherry Hill property was purchased as an investment essentially for the purpose of or with an aspiration to both spouses engaging in a joint venture operating an adult daycare facility on that property using Mrs. Moore's experience caring for her mother and Mr. Peoples' knowledge of nursing and experiential abilities to obtain the appropriate state licensure. It was later determined, however, that they were unable to obtain the necessary license and the intended facility never opened for business. When this venture failed (and around the time they separated), Mr. Peoples moved into the Cherry Hill property (living there from mid-2010 to May 2012) and Mrs. Moore lived in a separate rented property, never having herself lived in the Cherry Hill property.

Mrs. Moore also purchased the property at 14960 Grandville, Detroit, Michigan, on October 22, 2010 for $31,110 in cash. Title was placed solely in her name. The cash for this purchase was traceable to a single large withdrawal on that same day from Mrs. Moore's Community Choice Credit Union account #0910. Prior to that withdrawal, and between August 20, 2010 and October 13, 2010, there were four large deposits into that account, which the Court concludes were traceable to Mr. Peoples' wages. At some unspecified time, the couple moved into that Grandville property. Between the date Mr. Peoples filed his bankruptcy petition on December 10, 2012 and the April 8, 2014 date of the trial, that property was occupied as their primary residence. Mr. Peoples has apparently always paid all taxes, maintenance, utilities, and insurance on that property, and continued to do so.

Around the time the couple's separation ended in May 2012, they jointly decided to sell the Cherry Hill property on land contract, primarily because they could not afford to maintain it. The land contract dated May 4, 2012 was signed by Mrs. Moore only, as vendor, and provided for the vendees to pay the $30,000 total purchase price within three years of the closing date by making monthly payments of at least $1,107. Those payments were typically paid to Mrs. Moore by money orders, which she would then cash and then use those funds as she would ordinarily use other household income (i.e. to pay household expenses and to save any remaining money). She did indicate some of the land contract receipts were also used to pay back property taxes (which ran approximately $1,000 to $2,000 per year) and an old water bill (in the approximate amount of $700 to $800) associated with the Cherry Hill property. As of the trial date, the land contract vendees were close to completing the required land contract payments, despite some periodic delinquencies. Although the Cherry Hill property was titled solely in Mrs. Moore's name, on his individual 2010 tax returns (they normally filed separate returns), Mr. Peoples claimed the income and losses associated with that property and the related adult day care venture. Mr. Peoples also indicated that he considered the Cherry Hill property and the associated land contract proceeds to be shared "fifty-fifty" between him and his wife.

At the beginning of trial, Plaintiff indicated he discovered additional transfers that he felt were also avoidable fraudulent transfers from Mrs. Moore's Community Choice Credit Union account #5506. Plaintiff asserted that such cash transfers took place between July 15, 2011 and February 29, 2012 and totaled close to $25,000. Plaintiff alleges he discovered this bank account and these transfers less than one week before the scheduled trial and that such transfers were not referred to in Plaintiff's complaint because of what he alleges to be ongoing false statements by Mr. Peoples and Mrs. Moore during the course of the discovery process. The Court allowed
7

Plaintiff to present evidence of such transfers (to which Mr. Peoples and Mrs. Moore did not specifically object) and such therefore became part of the trial record and the issues to be decided by the Court.

### C. Plaintiff's Fraudulent Transfer Allegations as Against Mrs. Moore

Count I of Plaintiff's complaint against Mrs. Moore sought to avoid the transfers of money that Mr. Peoples made to Mrs. Moore for the purchase of the Grandville and Cherry Hill properties. Plaintiff relies on 11 U.S.C. § 548(a)(1)(B), which states in relevant part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily…
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

Plaintiff also brings similar allegations under two provisions of the Michigan Uniform Fraudulent Transfer Act (as made applicable to this proceeding via 11 U.S.C. § 544(b)), to wit: Mich. Comp. Laws §§ 566.34(1)(b) and Mich. Comp. Laws §§ 566.35(1). The Michigan

Uniform Fraudulent Transfer Act's "lookback period" is six years. Mich. Comp. Laws § 600.5813. Plaintiff is not seeking the return of either property, but rather a money judgment for the value thereof, pursuant to 11 U.S.C. § 550(a).

At the beginning of trial, Plaintiff argued that in light of the evidence to be presented, as well as the noted problems in the discovery process, the Court should allow Plaintiff to additionally assert a claim of *actual* fraudulent transfers against Mr. Peoples. Paragraph 21 of the complaint against Mrs. Moore alleges actual fraudulent transfers by her only, but Plaintiff argues he is entitled to a similar money judgment against Mr. Peoples as well because (a) Mr. Peoples, as the transferor of these allegedly fraudulent transfers, was complicit in the fraud and (b) a judgment against Mrs. Moore only would likely not be collectible. The Court declines to grant such money judgment because (a) the provision Plaintiff relies upon, § 550(a), a section that specifically provides for recovery against a *transferee* and Plaintiff has not cited to any governing law that would entitle him to recovery from Mr. Peoples as the *transferor*; (b) Mrs. Moore's perceived inability to pay any money judgment that might be rendered against her is not a legal basis for extending that liability to Mr. Peoples; and (c) this argument was not timely raised prior to trial, though it likely could have been.

Mr. Peoples and Mrs. Moore argued that there was no "transfer" of the subject real properties that can be used as a basis for the action, because the properties were both originally titled in Mrs. Moore's name. However, the subject transfers Plaintiff alleges were the fraudulent transfers are the transfers of *money* from Mr. Peoples to Mrs. Moore used to purchase those properties. Mr. Peoples and Mrs. Moore also argued that all monetary transfers relate back to the date of their marriage, i.e. when they decided to manage their finances in this manner (which would place the transfers outside the fraudulent transfer "lookback" periods). As this matter

concerns transfers of money, quite clearly the transfer dates are the actual dates the subject money was transferred. *See* 11 U.S.C. § 101(54).

The parties stipulated that Mr. Peoples was insolvent from January 1, 2009 to the trial date, that period covers the time of the purchases of the Grandville and Cherry Hill properties and the subject monetary transfers, and the insolvency requirement is thus met.

At trial, there was a great deal of testimony and evidence as to what funds were used to purchase, or contributed to the purchase of, each of the Grandville and Cherry Hill properties. Plaintiff's positions was that it was *solely* Mr. Peoples' income, while Mr. Peoples and Mrs. Moore took the position that Mrs. Moore's various income sources also contributed to those purchases in some unspecified amounts. Mrs. Moore testified that she brought about $6,000 to $7,000 of her own money into the marriage. She also testified that she set aside some savings because of the noted marital difficulties. Neither Mr. Peoples or Mrs. Moore were able to quantify the contributions that Mrs. Moore made to the purchase price of the two properties and no records were contemporaneously or otherwise made or kept that might shed persuasive light on those subjects. Indeed, that is a difficult (if not impossible) task to quantify the relative contributions because all their income appeared to be effectively pooled, their finances were managed in a generally fluid manner, and their household funds were largely spent on shared household expenses. One can conclude that Mrs. Moore's funds did contribute to some extent, but certainly far less than Mr. Peoples did. The facts also clearly indicated that substantially all of the household income emanated from Mr. Peoples' wages. Most, if not all, of Mrs. Moore's unemployment income was deposited into her Chase account, rather than into the Community Choice Credit Union accounts that were the actual immediate sources of the purchase price of the properties. Once deposited into the Chase account, that money was not segregated and those

account funds were debited for ordinary household spending. Quite clearly, there was a fluid inflow of money into the various accounts (overwhelmingly, as noted, from Mr. Peoples' wages) and a fluid outflow for shared household expenses. Essentially, Mrs. Moore's argument is that her various forms and sources of income were accumulated and preserved in the different bank accounts and effectively maintained as her personal savings. She essentially argues that whatever accumulation of money existed represents solely her own income and whatever money was spent was solely that of Mr. Peoples. Thus, she argues, whatever large sums of money were used to purchase the properties were or must have come from her own accumulated savings. Those claims fly in the face of the recited facts. The money was pooled without any delineation, formal or informal, and the couple spent that pooled money on shared household expenses and the subject properties. The Court is not persuaded by Mrs. Moore's efforts to now delineate certain amounts as her own savings and to claim that such amounts were untouched by any spending at any time. Based on the totality of the above noted evidence, the Court concludes that the source of the purchase prices of the Grandville and Cherry Hill properties were roughly 90% from Mr. Peoples' income and 10% from Mrs. Moore's various sources of income and savings. Mrs. Moore also argued that some of the allegedly fraudulently transferred funds are sourced from or traceable to transfers *prior* to the six year "lookback" period provided for by the Michigan Uniform Fraudulent Transfer Act. As noted, because of the fluidity of the couple's finances and the large disparity in the spouses' earnings, the Court finds that the amount of money that Mrs. Moore contributed prior to the six year "lookback" period, if any, would be relatively small and in any event such would not alter the indicated conclusions.

Plaintiff also alleges that Mr. Peoples did not receive reasonably equivalent value for his transfers of money to purchase the two properties, arguing that those transfers were not used for

11

ordinary household expenses, but rather for investments. Plaintiff asserts various badges of fraud, including: (a) Mr. Peoples and Mrs. Moore having a familial insider relationship; (b) the transfers taking place while Mr. Peoples was insolvent; (c) the transfers constituting all of Mr. People's compensation, and assets that potentially could have been non-exempt; (d) Mr. Peoples maintaining possession, use, and/or control of the transferred property; and (e) Mr. Peoples concealing the subject transfers. Mr. Peoples and Mrs. Moore argue that the "reasonably equivalent value" for these monetary transfers was Mr. Peoples financial support of Mrs. Moore, which should be seen as (a) a fulfillment of his legal and moral duties to support his wife and their dependents; and (b) compensation to Mrs. Moore for her domestic services, including for homemaking, childcare, and managing the household finances.

The Bankruptcy Code does not define the phrase "reasonably equivalent value." Section 548(d)(2)(A) defines "value" to mean "means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor[.]" A party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave, which is inherently a fact-driven analysis. *In re Charys Holding Co., Inc.*, 443 B.R. 628, 637 (Bankr. D. Del. 2010). Plaintiff bears the burden of proof by a preponderance on all of the required elements, including the in-equivalency of value. *In re Empire Interiors, Inc.*, 248 B.R. 305, 307 (Bankr. N.D. Ohio 2000). Various authorities provide that love, support, and affection cannot constitute "reasonably equivalent value" in the context of a fraudulent transfer inquiry, as explained in *Matter of Treadwell*, 699 F.2d 1050, 1051 (11th Cir. 1983):

> The daughters did not give their father property or satisfy or secure any of his debts. Hopefully, he already had their love and affection. Even if the love and affection of the daughters for their father increased $4,000 worth, it is of no benefit to the creditors. That his love and affection for them motivated the gift

> does not satisfy the intent of the statute. The object of section 548 is to prevent the debtor from depleting the resources available to creditors through gratuitous transfers of the debtor's property.

Also relevant is *In re Kelsey*, 270 B.R. 776 (B.A.P. 10th Cir. 2001), a case involving a wife's alleged agreement to forego employment outside the home, to care for the family, to provide comfort to her husband, etc. That Court opined: "Although no one has disputed Mrs. Kelsey's commitment to her family, she did not offer, nor have we located a single case that holds, that the love and support of a spouse constitutes reasonably equivalent value for purposes of 11 U.S.C. § 548." *Id.* at 781; *see In re Vansteinberg,* No. 01-15474, 2003 WL 23838125 (Bankr. D. Kan. Nov. 26, 2003) (discussing *Kelsey* with approval). Further support is found in *In re Bargfrede*, 117 F.3d 1078, 1080 (8th Cir. 1997) ("To the extent Stanley received indirect, non-economic benefits in the form of a release of a possible burden on the marital relationship and the preservation of the family relationship, we find these sufficiently analogous to other intangible, psychological benefits to conclude that they do not constitute reasonably equivalent value.").

Absent the foregoing case law supporting Plaintiff's position, the Court would nonetheless not be persuaded by Mr. People's and Mrs. Moore's arguments. While Mr. Peoples may have been under obligation to support his family (an obligation that he appears to have worked to, and indeed largely fulfilled), such obligation would have only been deemed consideration for the shared household expenses, and not for what Plaintiff challenges in this action, i.e. the transfers of large sums of money, including the money for the purchase of the Grandville and Cherry Hill properties. The Cherry Hill property was purchased as a joint profit-seeking investment, rather than any compensation or gift to Mrs. Moore. Insofar as Mr. Peoples temporarily lived in the Cherry Hill property while the couple was separated, that may indeed constitute some value, but

13

certainly not *reasonably equivalent* value compared to the full purchase price of the property. The Court therefore concludes that the money that Mr. Peoples transferred to Mrs. Moore for the purchase of the Cherry Hill property was a constructively fraudulent transfer. As to the Grandville property, the testimony indicated that the property was purchased, renovated, and at some point began being used as the couple's marital home. Mr. Peoples was at times living in this property despite the fact that it was titled solely in Mrs. Moore's name. Similarly, while such may constitute value given to Mr. Peoples for his transfer of money for the purchase price, such does not constitute *reasonably equivalent* value. The Court thus concludes that the money that Mr. Peoples transferred to Mrs. Moore for the purchase of the Grandville property was a constructively fraudulent transfer. Mr. Peoples' admitted insolvency at the time the monetary transfers were made, together with the lack of reasonably equivalent value he received, are sufficient to find them to be fraudulent transfers within the standards of 11 U.S.C. § 548(a)(1)(B) and Mich. Comp. Laws §§ 566.34(1)(b) and 566.35(1). In one sense, this is a classic constructively fraudulent transfer case where (a) an insolvent debtor transfers substantial sums of money to another person for little or no value; (b) those sums are thereafter used, to a substantial degree, for the debtor's benefit, including in joint business ventures; (c) the debtor maintains substantial control over the fruits of those monetary transfers; and (d) there is resulting prejudice to the debtor's creditors. While there may have been various reasons why the couple opted to title the two subject properties solely in Mrs. Moore's name, there is no escaping that the elements of a constructively fraudulent transfer have been satisfied.

Mr. Peoples and Mrs. Moore also argue that, because Mr. Peoples' wages were subject to wage garnishment (and, in at least on instance, were in fact so garnished), that such weighs against there being any fraudulent transfers. They essentially posit that because wage

14

13-06300-wsd    Doc 27    Filed 04/15/15    Entered 04/15/15 14:30:03    Page 14 of 18

garnishments are limited by 15 U.S.C. § 1673(a) to no more than 25% of his disposable earnings, that the remaining 75% would have been outside the reach of creditors in any event. While that may be true *with respect to wage garnishments under that procedure*, that does not in itself immunize Mr. Peoples from any fraudulent transfer of the funds remaining after that garnishment. Notwithstanding that Mr. Peoples' wages had been (or could have been) garnished, such does not render the remaining monies out of reach of creditors' other remedies.

As noted, Plaintiff additionally alleges that the transfers with respect to the Grandville and Cherry Hill properties were *actually* fraudulent transfers, i.e. that they were made "with actual intent to hinder, delay, or defraud[.]" 11 U.S.C. § 548(a)(1)(A); Mich. Comp. Laws § 566.34(1)(a). Given the Court's prior conclusion that those transfers are avoidable as constructively fraudulent transfers, the Court need not rule on such.

Plaintiff also alleged a fraudulent transfer of approximately $25,000 withdrawn from Mrs. Moore's Community Choice Credit Union account #5506. There were three large withdrawals from that account between September 23, 2011 and February 29, 2012. Obviously, those sums could not have been associated with the earlier purchases of the Grandville and Cherry Hill properties. Mrs. Moore testified that all such sums were spent on various household expenses, assistance to her mother, and payment of medical bills for a premature baby. As noted, Plaintiff is not seeking to avoid any monetary transfers that were used for ordinary household expenses. Regardless of how much of that money may have been traceable to Mrs. Moore's income or Mr. Peoples' income, the Court finds that Plaintiff has not met his burden of proving that these three transfers were used for anything other than ordinary household or other indicated expenses. As such, the Court concludes that such transfers are not avoidable as fraudulent transfers.

The Court thus concludes that Plaintiff is entitled to recover from Mrs. Moore $44,885.70 (which is 90% of the combined purchase prices of the Grandville and Cherry Hill properties) as constructively fraudulent transfers.

D. Plaintiff's Claim Disallowance Allegations Against Mrs. Moore

Plaintiff argued that the Court should disallow any possible claim that Mrs. Moore might have in Mr. Peoples' bankruptcy estate, pursuant to § 502(d). Such is better separately dealt with in the context of an objection, if any, to a filed proof of claim. In that connection, the Court notes that in any event, it does not appear she has filed a proof of claim and the deadline for doing so has expired. Such relief is thus denied.

E. Plaintiff's Motion for Sanctions Against Mrs. Moore

Plaintiff's Motion for Sanctions alleges that Mrs. Moore incorrectly testified at her deposition that Community Choice Credit Union account #0850 became account #0910, when in fact, account #0850 actually became account #5506, and account #5506 was not disclosed to Plaintiff until just before trial. Further, Plaintiff alleges that he was unable to obtain bank records for account #0850 (and perhaps other accounts), despite having requested statements for *all* bank accounts. In his motion, Plaintiff sought to have certain facts adverse to Mr. Peoples and Mrs. Moore admitted to be true at trial. These facts largely related to the Plaintiff's allegations that the money transferred from Mr. Peoples to Mrs. Moore were fraudulent transfers. Because the Court has largely ruled in favor of Plaintiff on his fraudulent transfer allegations, such a sanction is now in effect moot and is therefore denied.
16

The Court thus concludes that Plaintiff is entitled to recover from Mrs. Moore $44,885.70 (which is 90% of the combined purchase prices of the Grandville and Cherry Hill properties) as constructively fraudulent transfers.

D. Plaintiff's Claim Disallowance Allegations Against Mrs. Moore

Plaintiff argued that the Court should disallow any possible claim that Mrs. Moore might have in Mr. Peoples' bankruptcy estate, pursuant to § 502(d). Such is better separately dealt with in the context of an objection, if any, to a filed proof of claim. In that connection, the Court notes that in any event, it does not appear she has filed a proof of claim and the deadline for doing so has expired. Such relief is thus denied.

E. Plaintiff's Motion for Sanctions Against Mrs. Moore

Plaintiff's Motion for Sanctions alleges that Mrs. Moore incorrectly testified at her deposition that Community Choice Credit Union account #0850 became account #0910, when in fact, account #0850 actually became account #5506, and account #5506 was not disclosed to Plaintiff until just before trial. Further, Plaintiff alleges that he was unable to obtain bank records for account #0850 (and perhaps other accounts), despite having requested statements for *all* bank accounts. In his motion, Plaintiff sought to have certain facts adverse to Mr. Peoples and Mrs. Moore admitted to be true at trial. These facts largely related to the Plaintiff's allegations that the money transferred from Mr. Peoples to Mrs. Moore were fraudulent transfers. Because the Court has largely ruled in favor of Plaintiff on his fraudulent transfer allegations, such a sanction is now in effect moot and is therefore denied.

At trial, and in lieu of the "admission of adverse facts" that Plaintiff originally requested, Plaintiff orally moved for attorney's fees, which the Court had previously stated on the record were likely to be granted, given appropriate proofs. The Court will grant that request, as it believes there have been discovery delays and omissions that have hampered Plaintiff's performance of his duties as trustee and otherwise delayed disposition of this case, including necessitating an adjournment of trial. This involves particularly Mrs. Moore's Community Choice Credit Union accounts and the resulting confusion from her repeated affirmance that she only had one account with that institution. The evidence demonstrates that she was familiar enough with her own finances and that of Mr. Peoples to know the truth of the situation and to appropriately and timely acquire and disclose all the requested bank statements. Disposition of this issue (if Plaintiff desires to pursue it) shall be governed by the following procedure: by May 15, 2015, Plaintiff shall file and serve a memorandum (including specific time entries) indicating only the attorney fees and costs that he believes are attributable specifically, directly, and solely to such wrongful conduct, specifying by whom he believes such amounts should be payable, and setting forth a brief statement of legal basis for such liability. Mr. Peoples and Mrs. Moore shall have 21 days from the filing of such memorandum to respond with any objecting memorandum of their own. There shall be no reply. The Court will then decide whether or not to set a hearing or decide the matter on the said filed pleadings.

### F. Plaintiff's Denial of Discharge Allegations Against Mr. Peoples

Plaintiff alleges that Mr. Peoples, with intent to hinder, delay, and defraud the creditors, transferred and concealed money and property within one year prepetition, and thus his discharge should be denied pursuant to § 727(a)(2)(A). Plaintiff also argues that Mr. Peoples knowingly

and fraudulently made false oaths, omissions, and accounts in connection with this case by failing to disclose his interest in the real estate and cash balances, and thus his discharge should be denied pursuant to § 727(a)(4)(A).

The Court finds that Mr. Peoples' transfers to Mrs. Moore of his earnings were not made with the requisite intent to defraud. As noted, the couple's financial arrangement was longstanding and based on a variety of reasons, including convenience and preservation of marital harmony. To the extent that Mr. Peoples failed to adhere to legal formalities (as it appeared he did with some frequency), such is not sufficiently indicative of the necessary intent to defraud required to deny his discharge.

As to Mr. Peoples' omission of assets on his bankruptcy schedules, the Court also finds that there is likewise insufficient evidence of the requisite intent to defraud. He credibly testified that he disclosed all such assets to his attorney and Mr. Peoples' did not indicate any particular legal sophistication himself. Mr. Peoples appears to be a debtor in need of relief under the Bankruptcy Code. There is no necessary correlation between the proofs necessary to sustain a fraudulent transfer claim and a denial of discharge claim in this case, particularly when the former is premised on a constructive rather than actual basis.

Plaintiff shall present an appropriate order(s).

**Signed on April 15, 2015**

                                              **/s/ Walter Shapero**
                                        **Walter Shapero**
                                        **United States Bankruptcy Judge**